**Opinion issued July 23, 2026.**



In the

## Court of Appeals

for the

## First District of Texas

_____

### NO. 01-26-00103-CV

_____

## IN THE INTEREST OF J.G.S., A CHILD

---

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Case No. 2024-03008J**

---

## MEMORANDUM OPINION

In this accelerated appeal, Mother challenges the trial court's order terminating her parental rights to her child, J.G.S.[1] Mother argues on appeal that the trial court erred in terminating her parental rights because (1) the Department of Family Services (the Department) failed in her service plan to make reasonable

---

[1] We refer to the parties using pseudonyms. *See* TEX. R. APP. P. 9.8(b)(2).

accommodations for her alleged disability; (2) the trial court improperly refused to give Mother an extension of time in which to complete her service plan; (3) the trial court's termination of her parental rights under subsections 161.001(b)(1)(D), (E), and (N) of the Texas Family Code is not supported by clear and convincing evidence; and (4) the Department did not prove by clear and convincing evidence that termination was in J.G.S.'s best interest under subsection 161.001(b)(2).

Mother waived her reasonable accommodation argument by not raising it in the trial court, and the trial court did not abuse its discretion in denying Mother additional time to complete her service plan. For these reasons, and because sufficient evidence supports the trial court's findings under subsections 161.001(b)(1) and (2), we affirm.

**Background**

This appeal concerns the termination of Mother's parental rights to J.G.S., a child who was between the ages of one and two years old at the time of the December 10, 2025 trial. Following the trial, the trial court terminated Mother's parental rights based on its findings that (1) Mother had knowingly placed or knowingly allowed J.G.S. to remain in conditions or surroundings that endangered J.G.S.'s physical or emotional well-being, *see* TEX. FAM. CODE § 161.001(b)(1)(D); (2) Mother had engaged in conduct or knowingly placed J.G.S. with persons who engaged in conduct that endangered J.G.S.'s physical or

2

emotional well-being, *see id.* § 161.001(b)(1)(E); (3) Mother had constructively abandoned J.G.S., *see id.* § 161.001(b)(l)(N); and (4) termination of the parent-child relationship between Mother and J.G.S. was in J.G.S.'s best interest, *see id.* § 161.001(b)(2). Mother then filed this appeal.

**Reasonable Accommodations**

In her first point of error, Mother argues that the trial court erred in terminating her parental rights because, in her service plan, the Department did not make reasonable accommodations under the Americans with Disabilities Act (ADA) for her alleged disability.[2] Mother did not make this argument in the trial court,[3] and acknowledges this Court's ruling in *In re C.M.*, 996 S.W.2d 269 (Tex. App.—Houston [1st Dist.] 1999, no pet.), that an ADA violation is an affirmative defense that must be pleaded and/or proven in the trial court below to be preserved for appeal. *Id.* at 270. Appellee does not contest the application of the ADA to Mother's service plan, but argues that Mother waived her ADA defense.

---

[2]     In her brief, Mother references her "disability/perceived disability." Mother and the Department presented conflicting evidence at trial regarding the scope and status of Mother's alleged mental-health diagnoses. But it is undisputed that the Department sought termination of Mother's parental rights based in part on endangerment grounds that included Mother's alleged untreated mental illness. Amicus Disability Rights Texas notes that the mental-health conditions referenced in the parties' briefs are conditions that will almost always satisfy the ADA's definition of disability.

[3]     As discussed below, Mother filed a motion for an extension of her deadline to complete her service plan. However, she premised her request on scheduling obstacles arising from a course instructor's illness and technical issues connecting to a videoconference.

3

Mother asks this Court to reconsider its holding in *C.M.* in light of *In re N.G.*, 577 S.W.3d 230 (Tex. 2019), in which the Texas Supreme Court recognized "the interest of parents in the care, custody, and control of their children" as "[o]ne of the most fundamental liberty interests," requiring "heightened protection against government interference" under the due-process clauses of our federal and state constitutions. *Id.* at 235. Mother argues further or in the alternative that the prohibition in sections 161.001(f) and (g) of the Texas Family Code against terminating parental rights absent a showing that the Department made "reasonable efforts" to return the child to the parent[4]—a prohibition that went into effect in

---

[4]    Section 161.001(f) of the Texas Family Code mandates that:

> In a suit for termination of the parent-child relationship filed by the [Department], the court may not order termination of the parent-child relationship under Subsection (b)(1) unless the court finds by clear and convincing evidence and describes in writing with specificity in a separate section of the order that:
>
>      (1) the department made reasonable efforts to return the child to the parent before commencement of a trial on the merits and despite those reasonable efforts, a continuing danger remains in the home that prevents the return of the child to the parent; or
>
>      (2) reasonable efforts to return the child to the parent, including the requirement for the department to provide a family service plan to the parent, have been waived under Section 262.2015.

Neither side argues that a waiver under section 262.2015 occurred here. Section 161.001(g) provides further that: "In a suit for termination of the parent-child relationship filed by the [Department] in which the department made reasonable efforts to return the child to the child's home but a continuing danger in the home prevented the child's return, the court shall include in a separate section of its order written findings describing with specificity the reasonable efforts the department made to return the child to the child's home."

September 2023—should be read as requiring a showing that the Department provided a disabled parent a service plan that made reasonable accommodations for the parent's disability.

## A.      Application of ADA

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *Silguero v. CSL Plasma, Inc.*, 579 S.W.3d 53, 68 (Tex. 2019) (quoting 42 U.S.C. § 12132). Federal agencies charged with the enforcement of the ADA have taken the position that "Title II [of the ADA] covers essentially everything state and local governments and their agencies do," including a state child welfare system's "investigations, assessments, removals, family preservation, provision of services, determining goals and permanency plans, setting service plan tasks, reunification, guardianship, adoption, and assisting clients in meeting such tasks." *Grullon v. Admin. for Children's Servs.*, No. 18-CV-3129 (LJL), 2021 WL 981848, at *12 (S.D.N.Y. Mar. 16, 2021) (quoting Letter from U.S. Dep't of Just., Civ. Rights Div. & U.S. Dep't of Health & Hum. Serv., Off. for Civil Rights, to Interim Comm'r Erin Deveney, Mass. Dep't of Child. & Fams. (Jan. 29, 2015) (available

online at https://archive.ada.gov/ma_docf_lof.pdf)).[5] Amicus Disability Rights Texas argues that, under the ADA, a request for accommodation is not required if the disability and need for accommodation are known or obvious. *See Windham v. Harris Cnty.*, 875 F.3d 229, 237 (5th Cir. 2017) (noting that, when plaintiff fails to request accommodation under ADA, plaintiff can prevail on Title II claim only by showing that disability, resulting limitation, and necessary reasonable accommodation were open, obvious, and apparent).

Some states have passed legislation expressly requiring that a service plan for a parent from whose custody a child has been removed make reasonable accommodations for any disability the parent may have. *See, e.g.*, Colo. Rev. Stat. § 19-3-208(2)(g); S.C. Code § 63-21-20; W. Va. Code § 49-4-604(a)(1), (c)(5)(C). A number of state courts have held or otherwise indicated that the ADA's "reasonable accommodations" requirement is subsumed by an existing statutory requirement that "reasonable efforts" be made to reunify a child with the parent or parents from whose custody the child has been removed. *See, e.g.*, *In re Z.F.*, 338 A.3d 893, 917 (Md. 2025); *In re A.P.*, 868 S.E. 2d 692, 698 (N.C. 2022); *Jessica*

---

[5] *See also* U.S. Dep't of Just., Civ. Rights Div., *Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act*, ADA.GOV, https://www.ada.gov/resources/protecting-parent-rights/ (last visited June 30, 2026) (discussing application of Title II of ADA to parent service plans, service planning, and service plan compliance in child welfare context).

*P. v. Dep't of Child Safety*, 484 P.3d 148, 153 (Ariz. Ct. App. 2021); *In re K.L.N.*, 482 P.3d 650, 658-59 (Mont. 2021); *Lacee L. v. Stephanie L.*, 114 N.E.3d 123, 129 (N.Y. 2018); *In re H.C.*, 187 A.3d 1254, 1265 (D.C. 2018); *In re Elijah C.*, 165 A.3d 1149, 1166 (Conn. 2017); *In re Hicks/Brown*, 893 N.W.2d 637, 640 (Mich. 2017); *Lucy J. v. State Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1116 (Alaska 2010).

## B.     Texas Courts' Application of ADA

Texas has not passed legislation requiring that a service plan for a parent from whose custody a child has been removed make reasonable accommodations for any disability the parent may have. Mother and amicus Disability Rights Texas argue that the Department's internal guidelines require a service plan and that the service plan make accommodations for a parent's disability. But Mother has cited, and we have found, no Texas case holding that section 161.001(f)'s "reasonable efforts" prerequisite to termination requires a service plan, *see In re S.M.M.*, No. 01-22-00482-CV, 2022 WL 17981669, at *7 (Tex. App.—Houston [1st Dist.] Dec. 29, 2022, pet. denied) (mem. op.) (noting that, while implementation of service plan "is often the means by which the Department establishes its reasonable efforts to return a child to a parent, it is not the exclusive means of establishing that element"), much less a service plan that makes reasonable accommodations for a disabled parent's disability.

Instead, this Court and most other Texas courts of appeals have treated non-compliance with the ADA as an affirmative defense that must be pleaded and proven by the parent in the trial court. *See O.G.M. v. Dep't of Fam. & Protective Servs.*, No. 14-23-00424-CV, 2023 WL 8464998, at *6 (Tex. App.—Houston [14th Dist.] Dec. 7, 2023, no pet.) (mem. op.); *C.C.F. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-20-00152-CV, 2020 WL 4929782, at *3-4 (Tex. App.—Austin Aug. 19, 2020, pet. denied) (mem. op.); *In re B.L.M.*, 114 S.W.3d 641, 649 (Tex. App.—Fort Worth 2003, no pet.); *In re D.M.S.*, No. 11-16-00101-CV, 2016 WL 5853263, at *1 (Tex. App.—Eastland Oct. 5, 2016, no pet.) (mem. op.); *In re M.N.M.*, No. 05-14-00723-CV, 2014 WL 6737003, at *12 (Tex. App.—Dallas Dec. 1, 2014, pet. denied) (mem. op.); *In re C.L.*, No. 07-14-00180-CV, 2014 WL 5037982, at *3 (Tex. App.—Amarillo Oct. 7, 2014, no pet.) (mem. op.); *C.M.,* 996 S.W.2d at 270.[6] This approach mirrors Texas courts of appeals' treatment of section 161.001(d) of the Texas Family Code, which prohibits termination of parental rights based on a failure to comply with a court order under subsection (O)

---

[6] In some of these cases, the court assumed without holding that ADA non-compliance is a defense to parental termination. *See, e.g.*, *J.G. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-22-00790-CV, 2023 WL 3634364, at *7 (Tex. App.—Austin May 25, 2023, no pet.) (mem. op.); *In re M.N.M.*, No. 05–14–00723–CV, 2014 WL 6737003, at *12 (Tex. App.—Dallas Dec. 1, 2014, pet. denied) (mem. op.). Two courts of appeals have declined to recognize an ADA violation as a defense to parental termination. *See In re A.S.*, No. 09-21-00142-CV, 2021 WL 5113817, at *1 (Tex. App.—Beaumont Nov. 4, 2021, pet. denied) (mem. op.); *In re A.M.M.*, No. 06-05-00039-CV, 2006 WL 42229, at *6 (Tex. App.—Texarkana Jan. 10, 2006, no pet.) (mem. op.).

with which the parent sought in good faith to comply if the parent establishes an inability to comply with the order through no fault of the parent.[7]

Further narrowing its application, the Austin court of appeals has held that the defense of ADA non-compliance, like a defense under section 161.001(d), applies only to parental terminations under (now former) subsection (O) of section 161.001(b)(l) of the Texas Family Code. *See O.G.M.*, 2023 WL 8464998, at *6 n.4 ("We also note that to the extent that Texas appellate courts have recognized alleged ADA violations as an affirmative defense in termination proceedings, such an affirmative defense is only relevant to termination under subsection (O).").

We have found no case in which a Texas court of appeals has reversed a parental termination based on the Department's non-compliance with the ADA. Instead, Texas courts of appeals have generally held that the parent, through some combination of procedural failures, waived the defense in the trial court.[8] In one

---

[7] *See* TEX. FAM. CODE § 161.001(d) ("A court may not order termination under Subsection (b)(1)(O) based on the failure by the parent to comply with a specific provision of a court order if a parent proves by a preponderance of evidence that: (1) the parent was unable to comply with specific provisions of the court order; and (2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent."); *In re C.C.*, No. 01-23-00765-CV, 2024 WL 1558721, at *14 (Tex. App.—Houston [1st Dist.] Apr. 11, 2024, pet. denied) (mem. op.) (holding that, assuming parent had not waived section 161.001(d) defense, trial court did not err in holding that parent failed to meet burden of proof under that section); *In re B.J.F.*, No. 01-23-00522-CV, 2024 WL 117174, at *21 (Tex. App.—Houston [1st Dist.] Jan. 11, 2024, pet. denied) (mem. op.) (same).

[8] *See, e.g.*, *Udall v. Minns*, 730 S.W.3d 704, 738 (Tex. App.—Austin 2026, pet. denied) (parent "did not offer evidence at trial of accommodations that the trial

court should have made for her special needs"); *O.G.M. v. Dep't of Fam. & Protective Servs.*, No. 14-23-00424-CV, 2023 WL 8464998, at *6 (Tex. App.— Houston [14th Dist.] Dec. 7, 2023, no pet.) (mem. op.) (parent "never actually explained to the trial court what disability she had, what accommodations were necessitated by her disability, or what specific provisions of the ADA were violated" and did not request accommodations); *J.G.*, 2023 WL 3634364, at *7 (parent "did not introduce any evidence at trial demonstrating that she requested accommodations from the Department regarding drug testing or that any particular accommodations for that requirement were necessitated by her alleged disabilities"); *C.C.F. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-20-00152-CV, 2020 WL 4929782, at *4 (Tex. App.—Austin Aug. 19, 2020, pet. denied) (mem. op.) (parent "did not identify any specific provisions of the court order that were unworkable, explain how her mental illness was interfering with her efforts to comply, allege that her physical disability was interfering with any efforts, or provide any details or evidence related to her assertions"); *In re V.A.*, 598 S.W.3d 317, 330 n.5 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (noting that parent conceded she did not preserve ADA defense in trial court); *In re H.M.*, No. 09-18-00464-CV, 2019 WL 1837462, at *4 & n.26 (Tex. App.—Beaumont Apr. 25, 2019, no pet.) (mem. op.) ("After the trial court ordered Mother to comply with the parenting plan, the record does not show that Mother ever made the trial court aware she had a disability that interfered with her ability to comply with the trial court's order." (citing TEX. R. APP. P. 33.1)); *In re D.M.S.*, No. 11-16-00101-CV, 2016 WL 5853263, at *1 (Tex. App.—Eastland Oct. 5, 2016, no pet.) (mem. op.) (parent "pleaded no such affirmative defense, and the trial court made no findings with respect to the Department's ADA compliance"); *In re P.M.*, No. 02-14-00205-CV, 2014 WL 8097064, at *33 (Tex. App.—Fort Worth Dec. 31, 2014) (mem. op.) (parent "did not plead, prove, or obtain a finding on the affirmative defense"); *M.N.M.*, 2014 WL 6737003, at *12 (parent "does not address the requirement to 'plead, prove, and secure findings' respecting her [ADA] complaint or explain how the record shows that requirement was satisfied, nor does the record show [she] specified in the trial court any provision of the ADA with which there was no compliance"); *In re C.L.*, No. 07-14-00180-CV, 2014 WL 5037982, at *4 (Tex. App.—Amarillo Oct. 7, 2014, no pet.) (mem. op.) ("As an affirmative defense the theory of ADA compliance was neither plead nor proved and no instructions, definitions, or questions concerning such a theory were submitted to the jury."); *McKay v. Dep't of Fam. & Protective Servs.*, No. 01-06-00568-CV, 2007 WL 1775985, at *4 (Tex. App.—Houston [1st Dist.] June 21, 2007, no pet.) (mem. op.) (parent did not "plead, prove, and secure findings sustaining an affirmative defense related to DFPS's alleged noncompliance with the ADA"); *A.M.M.*, 2006 WL 42229, at *6 (parent "did not plead or prove a violation of the A.D.A."); *In re J.I.*, No. 2-04-299-CV, 2005 WL 1047891, at *14 (Tex. App.—Fort Worth May 5, 2005, no pet.) (mem. op.) (parent "failed to plead or

such case, the court of appeals held further that the affirmative defense of ADA non-compliance must be pleaded and proven in the trial court even if the Department sought termination of the parent-child relationship based in part on the parent's disability, and thus arguably should have anticipated the affirmative defense. *See B.L.M.*, 114 S.W.3d at 649 (rejecting application of Texas Supreme Court case law permitting party to raise unpleaded affirmative defense on appeal where opposing party anticipated affirmative defense by its pleading, holding that "it cannot be said that . . . pleading the parent-child relationship should be terminated under the mental health grounds found in family code section 161.003 anticipates the defense of a possible ADA violation.").

The applicable precedent, including this Court's holding in *C.M.* that ADA non-compliance is an affirmative defense in a parental-termination case that must be pleaded and/or proven in the trial court, offers no basis on which we may consider Mother's ADA non-compliance defense. Mother admits she did not raise the defense in the trial court. Mother asks us to revisit our decision in *C.M.* in light of the adoption of sections 161.001(f) and (g) of the Texas Family Code and the

---

prove her contention that TDFPS violated the ADA by failing to accommodate her mental deficiencies associated with bipolar disorder"); *In re B.L.M.*, 114 S.W.3d 641, 649 (Tex. App.—Fort Worth 2003, no pet.) (parent "did not plead or prove his contention that TDPRS violated the ADA by failing to accommodate his mental deficiencies and provide him with services designed for his special needs as a schizophrenic"); *In re C.M.*, 996 S.W.2d 269, 270 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (parent "did not plead or prove a violation of the ADA").

Texas Supreme Court's recognition in *N.G.* that "the interest of parents in the care, custody, and control of their children" is a fundamental liberty interest, requiring "heightened protection against government interference" under the due-process clauses of our federal and state constitutions. *N.G.*, 577 S.W.3d at 235; *see also Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (noting that involuntary termination statutes are strictly construed in favor of parent). But we are reluctant to depart from our own precedent and the rule applied by the majority of Texas courts of appeals absent direct guidance from the supreme court. *See Grapevine Excavation, Inc. v. Maryland Lloyds*, 35 S.W.3d 1, 5 (Tex. 2000) ("Adhering to precedent fosters efficiency, fairness, and legitimacy."). We thus overrule Mother's first point of error.

## Denial of Extension of Time to Complete Services

In her second point of error, Mother argues that the trial court abused its discretion by failing to grant her November 21, 2025 motion for an extension of her deadline to complete her service plan. The Department argues that Mother did not preserve her complaint for appellate review.

To preserve her complaint for appellate review, the appellate record must show either that (a) the trial court denied Mother's motion or (b) the trial court refused to rule on Mother's motion and Mother objected to that refusal. TEX. R. APP. P. 33.1(a)(2). The appellate record does not show that Mother's motion was

ever set for hearing or ruled upon by the trial court. *See Noel v. Oakbend Med. Ctr.*, No. 01-21-00206-CV, 2022 WL 3031347, at *7 (Tex. App.—Houston [1st Dist.] Aug. 2, 2022, pet. denied) (mem. op.) ("Simply filing a motion or even setting the motion for hearing is insufficient to preserve error if the record does not also show the motion was brought to the trial court's attention. The complaining party must get a ruling—either express or implied—from the trial court." (citation modified)). Nor does the appellate record show that the trial court refused to rule on Mother's motion. *See Harris Cent. Appraisal Dist. v. Hou. Pipe Line Co.*, 706 S.W.3d 568, 577 (Tex. App.—Houston [1st Dist.] 2024, no pet.) ("[A] mere failure to rule is not one and the same thing as a refusal to rule. A trial court must neglect or decline to rule in the face of an objection to its failure to rule in order for a party to preserve error based on the court's refusal to rule."). If the trial court did not have the opportunity to exercise its discretion, it cannot be said to have abused that discretion.

Mother's counsel may have referred to the motion in her direct examination of Mother at trial, in this exchange:

> [Mother's counsel]: Then you come back to Houston and you're trying to get your services on track, correct?
>
> [Mother]: Correct.
>
> [Mother's counsel]: That's why we were reurging to the Court that you wanted a short continuance so you can reunite with your child through completion of your services, correct?

[Mother]: Correct.

But even assuming Mother's counsel was referring to Mother's motion in this exchange, the reference is insufficient to satisfy rule 33.1(a)(2). We overrule Mother's second point of error.

**Sufficiency of the Evidence**

In her third and fourth points of error, Mother argues that the trial court's termination of her parental rights under subsections 161.001(b)(1)(D), (E), and (N) of the Texas Family Code is not supported by clear and convincing evidence. In her fifth point of error, Mother argues that the Department did not prove by clear and convincing evidence that termination was in J.G.S.'s best interest under subsection 161.001(b)(2).

**A.      Standard of Review**

In a case to terminate parental rights under section 161.001 of the Texas Family Code, the Department must establish that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child. TEX. FAM. CODE § 161.001(b). Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The Department must prove both elements—i.e., both the statutorily prescribed predicate finding(s)

14

and that termination is in the child's best interest—by clear and convincing evidence. *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). The Family Code defines "clear and convincing evidence" as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

When assessing the legal sufficiency of the evidence in a termination proceeding, we consider all evidence in the record in the light most favorable to the trial court's finding and decide "whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005) (discussing elevated standard of review in parental termination cases). We assume that any disputed facts were resolved in favor of the finding if a reasonable factfinder could have done so. *J.F.C.*, 96 S.W.3d at 266. When "no reasonable factfinder could form a firm belief or conviction" that the matter on which the Department bears the burden of proof is true, we "must conclude that the evidence is legally insufficient." *Id*. In reviewing the evidence's factual sufficiency, we consider the entire record, including disputed evidence. *Id*. The evidence is factually insufficient if, considering the entire record, the disputed evidence that a reasonable factfinder could not have resolved in favor of the finding is so

significant that the factfinder could not reasonably have formed a firm belief or conviction. *Id.*

We give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). The factfinder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109.

## B. Predicate Findings Under Subsections (D) and (E)

Protection of the best interests of the child is the primary focus of a termination proceeding. *See A.V.*, 113 S.W.3d at 361. However, a parent's rights to the "companionship, care, custody, and management" of a child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982) (citation modified); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). Accordingly, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20-21.

Here, the trial court terminated Mother's rights under subsections 161.001(b)(1)(D), (E), and (N). The Texas Supreme Court has held that, because subsection (M) provides a basis to terminate parental rights due to a prior subsection (D) or (E) finding, due process concerns coupled with the requirement for a meaningful appeal require that, if an appellate court affirms a termination

16

order based on a (D) or (E) finding, the court must provide the details of its analysis. *See N.G.*, 577 S.W.3d at 236-37. Further, because termination under subsection (D) or (E) may justify termination of parental rights to other children in future cases, we must review both grounds, even though only one ground is sufficient to support termination. *In re R.R.A.*, 687 S.W.3d 269, 279 (Tex. 2024) (citing *N.G.*, 577 S.W.3d at 235-37; TEX. FAM. CODE § 161.001(b)(1)(M)); *see* TEX. FAM. CODE § 161.001(b)(1)(M) (providing as ground of termination that parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E)").

Section 161.001(b)(1)(D) of the Family Code provides that the trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(D). Section 161.001(b)(1)(E) provides that the trial court may terminate a parent's rights if the trial court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E).

17

Because evidence concerning termination under subsections (D) and (E) is interrelated, we may consolidate our examination of the evidence for both grounds. *In re A.J.H.*, No. 01-18-00245-CV, 2019 WL 190050, at *8 (Tex. App.—Houston [1st Dist.] Jan. 15, 2019, no pet.) (mem. op.) (citing *In re M.T.W.*, No. 01-11-00162-CV, 2011 WL 6938542, at *13 (Tex. App.—Houston [1st Dist.] Dec. 29, 2011, no pet.) (mem. op.); *In re J.T.G.*, 121 S.W.3d 117, 126 (Tex. App.—Fort Worth 2003, no pet.)). "Endanger" is a term used in both subsections (D) and (E). To "endanger" a child means to jeopardize the child or expose him or her to loss or injury. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (citing *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). While endangerment often involves physical jeopardy, the statute does not require that endangering conduct be directed at a child or that the child actually suffer any injury; rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Boyd*, 727 S.W.2d at 533; *In re N.J.H.*, 575 S.W.3d 822, 831 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (mem. op.). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re J.S.*, 584 S.W.3d 622, 635 (Tex. App.—Houston [1st Dist.] 2019, no pet.). The Department does not need to establish that a parent intended to endanger a child to support termination based on endangerment. *In re M.A.J.*, 612 S.W.3d 398, 407 (Tex. App.—Houston [1st Dist.] 2020, pet. denied).

18

Although subsections (D) and (E) both focus on endangerment, "they differ with regard to the source and proof of endangerment." *In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (citing *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.), *overruled on other grounds by In re L.C.L.*, 599 S.W.3d 79 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (en banc)). Subsection (D) concerns the children's living environment, rather than the parent's conduct, although the parent's conduct can affect the children's environment. *Id.* Under subsection (D), "knowingly" does not require that a parent have "certain knowledge that an actual injury is occurring." *In re L.M.M.*, 522 S.W.3d 34, 44 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (citing *A.S.*, 261 S.W.3d at 83). Rather, a parent acts "knowingly" when he or she is aware of the potential danger but disregards that risk. *Id.* Under subsection (E), the evidence must show that the endangerment was the result of the parent's conduct, including acts, omissions, or a failure to act. *In re K.P.*, 498 S.W.3d 157, 171 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). Under that subsection, courts may consider conduct both before and after the child's birth and before and after the Department removed the child from the home. *In re J.A.R.*, 696 S.W.3d 245, 254 (Tex. App.—Houston [14th Dist.] 2024, pet. denied); *In re J.D.G.*, 570 S.W.3d 839, 851 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).

### 1. Endangerment evidence at trial

The trial court heard evidence at trial from a Department investigator, Mother, and a Child Protective Services (CPS) supervisor.

***Department investigator's testimony.*** The trial court heard testimony from a Department investigator that the Department began its investigation in December 2024, when J.G.S. was two months old. The investigator testified that the Department was told by Texas Children's Hospital that Mother brought J.G.S. to the hospital because of a fever.[9] She said that the hospital's medical staff were concerned that J.G.S. had not gained any weight since her birth. The investigator testified that the medical staff attributed the deficiency mostly to J.G.S.'s diet but were also investigating whether J.G.S. had "something . . . inside her blood that they [saw] that would also contribute for her to have the failure to thrive." She said that she was told that the medical staff believed that Mother was not feeding J.G.S. sufficient formula and was feeding J.G.S., in its place, diluted packaged iced tea and grape juice. According to the investigator, once J.G.S. was admitted to the hospital and given formula by or under supervision of the medical staff, J.G.S.

---

[9] A medical records exhibit introduced at trial includes a timeline of Mother and J.G.S.'s visit to the emergency room at Texas Children's Hospital. They arrived at 8:51 p.m. on December 4, 2024. An emergency room nurse notes at 9:12 p.m.: "Per mom patient has not had weight gain since birth and unable to get formula due to her wick [WIC] running out and is breastfeeding 2x/day. Mom is also feeding patient grape juice and per mom patient is having 2 wet diapers per day." There is no mention of a fever and the nurse notes at 9:16 p.m. that J.G.S.'s temperature is 97.4 degrees Fahrenheit.

began gaining weight. She testified that the hospital kept the formula for J.G.S. at the nursing station. She said that the nurses would "come in and give mom the bottle to feed [J.G.S.]. If not, the nurses would do it because mom was not writing down the proper ounces that she was giving the child."

Department investigators, including the investigator who testified at trial, visited Mother and J.G.S. at the hospital. The investigator said that J.G.S. appeared to be small for her age. Her impression was that Mother did not fully understand the seriousness of the situation. She testified that Mother told her she had just moved into the house in which she was currently living, and did not have enough furniture. According to the investigator, Mother gave her contradictory information about how she was feeding J.G.S. Mother claimed the home was "fully stocked" with food, but also told the investigator that she had run out of the specific type of formula J.G.S. needed about 10 days earlier, and during that period had been feeding J.G.S. the iced tea and grape juice instead. The investigator testified that Mother told her that she had at times used juice as a substitute for milk with her two other children also, if she ran out of milk. (Mother has custody of her two older children, who live with their father due to Mother's financial issues.) The investigator said that Mother told her that she was selling her food stamps, but that Mother attributed running out of the formula to transportation issues.

The Department concluded that J.G.S. was in immediate danger in Mother's home because there was reason to believe that Mother was selling her food stamps, did not have adequate appropriate food in the home for J.G.S., and had fed J.G.S. diluted packaged iced tea and juice. The Department also concluded that there was reason to believe that Mother was neglectful in supervising J.G.S. "because [Mother] also mentioned to [the investigator] that [Mother] was smoking weed." According to the investigator, Mother did not know anyone in Houston or elsewhere who could take custody of J.G.S. or serve as a monitor should Mother retain custody. J.G.S.'s maternal grandmother was in the process of moving from Dallas to Atlanta, and offered a home to Mother and J.G.S., but according to the investigator Mother did not want to move from where she was currently living.

The investigator testified further that her investigation had uncovered reports of "[d]omestic violence with [Mother's] ex-partner, the child's father." She said that Mother had also told her that she had been diagnosed with mental health issues—"Bipolar, schizophrenia, postpartum depression"—and also had PTSD and anxiety. Mother said that she had been prescribed medication, and was taking the medication, but did not take it consistently. According to the investigator, Mother said that she did not have any utilities in her home. The investigator said that Mother had not been taking J.G.S. to the doctor prior to taking J.G.S. to the hospital.

***Mother's testimony.*** Mother testified that she brought J.G.S. to the emergency room at Texas Children's Hospital to try to get a new prescription for formula for J.G.S. because the specific formula prescribed by Mother's local WIC office—an office of Texas Health and Human Services' Women, Infants, and Children program—was not available at any store near Mother. She had also telephoned the hospital. Mother said that J.G.S. had weighed six or seven pounds at birth, and weighed seven pounds when she was admitted to the hospital. Mother acknowledged that she had not previously taken J.G.S. to any medical or well-check visits since her birth, but said that she had been in the process of trying to find a primary care physician who would take her insurance. She said that she had noticed in the week before going to the hospital that J.G.S. had a cough, but had not noticed a fever. Mother said that she had been out of formula just two days when she came to the hospital,[10] and had been using formula just to supplement breastfeeding, two to three hours after breastfeeding. Mother was concerned she was not producing enough breast milk, but not that J.G.S. was not receiving adequate nutrition.

---

[10] This testimony is supported by notes the Department investigator made from an interview with Mother the day after she brought J.G.S. to the hospital. The investigator notes that Mother stated that she "did not give her daughter formula for about one or two days and was only breastfeeding during that time," but also "started diluting juice with water."

Mother denied telling the Department investigator that she had sold her food stamps or had been out of formula for over a week. She explained that she had been looking unsuccessfully at local stores for J.G.S.'s particular brand of formula for roughly a week before going to the hospital, but had been looking before she ran out. She denied having fed grape juice or iced tea to J.G.S.—or to her other children, when they were infants. She testified that her mother helped her with bills because she was unable to find a job. She acknowledged that her electricity had gone out just before she took J.G.S. to Texas Children's Hospital, but said that it was a one-time incident and was only out for a day or two total.

Mother testified that she had not told the Department investigator that she had any mental health diagnoses. She told the investigator that she had suffered from post-partum depression only after the birth of the second of her two older children, and had ultimately been able to dip into her 401(k) at that time to enable her to stay home with the children for a period before returning to work as a phlebotomist. She denied having ever been diagnosed as schizophrenic. Mother testified that, while pregnant with J.G.S., she had been prescribed Zoloft for anxiety and depression. She said that she had told the investigator that she was not currently taking Zoloft. Mother underwent a psychological evaluation as part of her services plan and, in that evaluation, denied having any mental health diagnoses. She testified that she was unaware of any diagnoses resulting from that

24

evaluation. Mother testified that she was not currently seeing any mental-health provider on a regular basis or going to any counseling, support groups, or therapy. She said that she had recently had a follow-up appointment with a mental-health provider regarding help with depression but was unsure "what other services they are requiring that I do." She said that she had not yet been referred to continuing services. At the time of trial, the medications she was on were medications she had been prescribed in 2023. One was oxcarbazepine. She could not remember the name of the other.

When asked if she remembered reporting that she had smoked marijuana two days before J.G.S.'s hospitalization, she answered no. She also testified that she did not remember saying that she had smoked marijuana occasionally throughout her pregnancy, and denied having done so. Mother acknowledged that, in 2019, she tested positive for marijuana and the hair of one of her older children also tested positive for marijuana. But she said that she had stopped using marijuana in 2018, or possibly as early as 2017. As of the time of trial, there were no criminal charges pending against Mother and she was not on probation for any crime.

While Mother complained that her service plan requirements had expanded over time, she believed she had been diligently working her services and had completed all requirements in her service plan except her domestic violence

classes. She had completed her psychosocial assessment and a six-week parenting class. As of the time of trial, she had attended only roughly half of her domestic violence classes, and said she believed it is important for a child to have a home that is free of the cycle of domestic violence. She testified that she had been the victim of domestic violence in the past, but was no longer with the ex-partner referenced in the domestic violence allegations. Mother said that she had missed domestic violence classes during a period when she was unable to pay her telephone bill and that, once her service was restored, she was told there were no more classes until the month after trial. Mother was also required to submit to drug testing throughout the pendency of her case. While she did not report for every testing date, she tested negative when she did report. Mother's visits with J.G.S. were suspended for a short period. Mother testified that she did not know the reason for the suspension, but that she was in Dallas for a period of time "getting the court paperwork for custody of [her] other two children." Having returned to Houston, Mother sought a short continuance of her service plan so that she could reunite with J.G.S. through completion of her services. When asked later if she was aware that her visitations had been suspended pending her engagement in mental-health services, she responded: "That wasn't clear, but since it has been reiterated, yes."

Mother testified that, as of the time of trial, she had a 24-month lease on a house that would terminate in July of the following year. She said that she had received a housing voucher from the Houston Area Women's Center, and was required to either pursue employment or schooling to stay in their housing program. Mother was not currently employed but was looking for employment "every day." She has previously worked as a phlebotomist. Mother's grandmother was helping her with her electricity bill. Mother testified that her mother had moved back to the Dallas area in 2024 and, at the time of trial, was living in Arlington, Texas. Mother testified that, given her inability to find work, she was looking at moving in with her mother.

***CPS supervisor's testimony.*** The CPS supervisor testified that she had overseen Mother's case for roughly a year, and had worked with Mother's caseworker on developing Mother's family service plan. The supervisor testified that Mother had "recently started to engage in her services," and had completed her psychological evaluation and course of parenting classes, respectively, in August and September 2025. But she said that Mother had not completed other requirements, and that the Department "still has concerns in regard to her ability to parent and understand the needs and well-being of a child of vulnerable ages and to care for them throughout their life span."

With regard to Mother's mental health, the supervisor testified that: "the mother has gone back and forth with -- in the acceptance of mental health diagnosis, any follow-through with the evaluations that will determine the needs for medication or different treatment recommendations." She said that Mother had not completed any mental-health counseling, despite the Department's having made referrals "to get assessments completed."

The supervisor testified further, regarding the "domestic violence concerns," that those concerns were never fully addressed. The supervisor confirmed that Mother had completed four of the eight required classes in the domestic violence program in her service plan. The supervisor acknowledged that Mother was the victim and not the perpetrator of domestic violence, and Mother's testimony that she was no longer in an abusive relationship, but said that the Department wants to ensure that Mother "doesn't develop a pattern of continuing to get [in] and [can] recognize those same types of situations or relationships in the future."

The supervisor said that her understanding was that Mother's visitations had been suspended in June, after Mother missed visits in April and May because she was in Dallas. She noted that Mother had returned to Houston in June,[11] but had not visited or had other contact with J.G.S. since the suspension. The Department

---

[11]   However, when the trial court later asked the supervisor whether it was her understanding that Mother "did move to Dallas for several months . . . this past year," the supervisor responded yes.

was not requesting that Mother be permitted to visit J.G.S. because the Department had not "seen the change and willingness to make any efforts to mitigate the initial issues that brought the child into care to prove that she's ready to go back into exhibiting parenting skills."

The CPS supervisor testified that the Department was requesting that Mother's parental rights to J.G.S. be terminated so that J.G.S. could be adopted. She believed that the Department had made reasonable efforts in offering Mother services to reunite Mother with her child and, in the alternative, to try to place J.G.S. with a relative. The CPS supervisor testified that the Department had looked at every potential caretaker whom Mother had named. She said that J.G.S.'s maternal aunt, in Chicago, indicated she was unable to care for J.G.S. J.G.S.'s maternal grandfather, in Nashville, was unable to take J.G.S. due to financial concerns. The Department also looked at another relative, in Louisiana, who was unable to care for J.G.S. because she was already caring for her husband. She testified that the Department had "reached out to [J.G.S.'s] maternal grandmother . . . several, several times throughout the entire pendency of this case." She stated further that J.G.S.'s maternal great-aunt and maternal great-grandmother were not viable options.

*Trial exhibits*. In her closing statement, counsel for the Department called the trial court's attention to a December 2024 affidavit from the Department

investigator who had testified at trial "outlining [Mother's] admission that she was feeding a child younger than three months old inappropriate nutrition by Arizona Tea, water, grape juice." The investigator's affidavit mentions grape juice and iced tea in a section of the affidavit titled "Present Referral and Allegations," in which the investigator stated in part:

> On **December 05, 2024,** the Department . . . received a referral regarding Medical Neglectful and Neglectful Supervision of 2-month-old [J.G.S.] by [Mother]. The referral generated from [Mother] called 9-1-1, concerned that her infant daughter, [J.G.S.], was not resting. [Mother], who has auditory schizophrenia, bipolar, severe depression, postpartum depression, and anxiety struggles to provide proper care; she has been selling her food stamps, and [J.G.S.] has been drinking only Arizona Iced Tea and grape juice for weeks.

In the affidavit, the investigator does not identify the source of the information regarding J.G.S.'s drinking iced tea and grape juice. The Department investigator testified at trial that the referral came from medical staff at the hospital. The hospital's medical records, which the Department also introduced as an exhibit at trial, contain several references to Mother's saying she had fed J.G.S. diluted juice, tea, or both, but also several notes stating that Mother would also breastfeed J.G.S. The only note in the medical records regarding the time period over which Mother had fed J.G.S. diluted juice, tea, or both is a note stating that: "Per records and mother, mom reportedly was offering [J.G.S.] breast milk twice weekly and juice over the last week."

30

Counsel for the Department also drew the trial court's attention to J.G.S.'s medical records, which counsel characterized as "outlin[ing] that [J.G.S.] was extremely malnourished." Those records contain many references to J.G.S.'s being possibly malnourished, and a few references to a diagnosis of "severe malnutrition" as evidenced by J.G.S.'s small weight gain since birth. Under the heading "Nutrition Diagnosis," the medical records state: "Increased nutrient needs related to malnutrition/malabsorption as evidenced by growth failure. Malnutrition Diagnosis: Severe malnutrition Related To: Social/environmental/behavioral As Evidenced By: Weight gain velocity <25% of the norm for expected weight gain."

Counsel for the Department told the trial court that the same exhibit of medical records also "outlines the concerns for medical neglect due to lack of follow-up with primary care physicians, especially when changes were noted." Counsel made specific reference to a note in the hospital records that J.G.S. "was not see[n] by a pediatrician since birth hospital discharge. Mom explained that she was dealing with housing instability and had no transportation to the doctor's office." Elsewhere in the medical records exhibit, two separate physicians note that J.G.S.'s failure to thrive is "non-specific for" (i.e., not necessarily) physical neglect, but "concerning" (or similar) for medical neglect.

Counsel for the Department also referenced in her closing argument Mother's "statements to medical professionals and to the investigator that she was

struggling with post-partum depression, schizophrenia, depression and anxiety."

The medical records exhibit contains a passing reference to Mother's "untreated mental health" being a risk factor relevant to the child welfare investigation. The records include the following few references to Mother's mental health:

- "Mother has a history of bipolar disorder [and] depression . . ."

- "Mom has diagnosis of Bipolar and Schizophrenia that are currently untreated."

- In list of circumstances surrounding J.G.S.'s birth: "untreated bipolar disorder" and "depression"

The medical records do not note the source of this information.

## 2. Analysis

The evidence at trial was legally and factually sufficient to support the trial court's endangerment findings. Considering all evidence in the record in the light most favorable to those findings, and deferring to the trial court as the sole arbiter when assessing the credibility and demeanor of witnesses, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that the trial court's endangerment findings were true. *See J.F.C.*, 96 S.W.3d at 266; *H.R.M.*, 209 S.W.3d at 108. While many of the fact issues material to those findings were disputed at trial, we have not found disputed evidence that a reasonable factfinder could not have resolved in favor of the trial court's endangerment findings that is

so significant that the trial court could not have reasonably formed a firm belief or conviction in its endangerment findings. *J.F.C.*, 96 S.W.3d at 266.

There was evidence at trial of Mother's medical neglect of J.G.S. As noted in the medical records introduced at trial, newborn babies should be seen by a medical provider to ensure adequate nutrition, weight gain, and development. The records note further that the fact that a "caregiver should be aware to seek medical care for a young infant" had been discussed with Mother when she was discharged after giving birth. By Mother's own account, J.G.S. had gained at most just a pound since she was born. Mother admitted at trial that, before bringing J.G.S. to the emergency room on December 4, 2024, she had not taken J.G.S. to any medical or well-check visits since her birth. J.G.S.'s hospital records include a diagnosis of "severe malnutrition" as evidenced by a weight-gain velocity under 25 percent of the expected norm. *See In re A.B.*, 437 S.W.3d 498, 506 (Tex. 2014) (concluding that some evidence supported termination under subsection (E) based in part on failure to thrive diagnosis and medical testimony that child was severely malnourished). Physicians who reviewed J.G.S.'s case at the hospital, including a consulting physician from the hospital's CARE Team,[12] found her presentation to be non-specific for physical neglect, i.e., not necessarily caused by physical neglect, but "concerning" for medical neglect. *See In re J.H.*, No. 01-22-00629-

---

[12] Based on references in J.G.S.'s medical records, the hospital's "CARE Team" is consulted in cases of suspected child abuse.

CV, 2023 WL 2169952, at *14 (Tex. App.—Houston [1st Dist.] Feb. 23, 2023, pet. denied) (mem. op.) (noting that "a parent's neglect of her child's medical . . . needs endangers the child" and citing cases in which medical neglect was held to be evidence of endangerment under subsection (D)); *J.D.G.*, 570 S.W.3d at 852 (noting failure to provide medical care for child may constitute endangering conduct under subsection (E) even if parent did not cause need for medical treatment).

In addition, while there was conflicting evidence at trial regarding Mother's mental health, including what mental-health diagnoses Mother may have received, that evidence included evidence suggesting that Mother's untreated mental illness caused or contributed to the medical neglect of J.G.S. *See In re A.A.*, No. 01-25-01074-CV, 2026 WL 1689341, at *9 (Tex. App.—Houston [1st Dist.] June 11, 2026, no pet. h.) (mem. op.) (noting that, "[w]hile mental illness alone is not grounds for terminating the parent-child relationship, untreated mental illness can expose a child to endangerment and is a factor that the court can consider" under subsection (E)); *In re A.L.H.*, 515 S.W.3d 60, 91 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (same).

The Department alleged in its pleading seeking the termination of Mother's parental rights to J.G.S. that Mother "is unmedicated, and her mental illness significantly affects her ability to care for" J.G.S. The pleading included a copy of

34

notes regarding a conversation that a Department investigator allegedly had with medical staff and a social worker a week after J.G.S. presented at the hospital, stating:

> The doctor and nurses are concerned about the mother's adherence to feeding schedule and instructions. [J.G.S.] had a fever but is currently stable and not receiving antibiotics. The concerns that [Mother] mental health and ability to care [sic] because she has been diagnos[ed] with auditory schizophrenia, depression, severe anxiety and post-partum depression. She is not currently on her prescribed medications. Her behavior is observed as detached and flat, she lacks emotional engagement with [J.G.S.]. The concerns were raised about her ability to follow instructions and care for the baby at home. The medical staff and social worker [are] concern[ed] that if the baby is discharged home there is a high risk of the baby returning due[] to inadequate care. They had stated the baby[']s nutritional need[s] [are] critical for brain development and malnutrition could lead to development issues. There is a need for evaluation for psychiatric evaluation of [Mother] to assess her understanding and capability to care for her child.

Those notes are followed by allegations of a number of incidents in the hospital in which Mother seemed unable or unwilling to follow instructions regarding feeding J.G.S.

A consulting physician who reviewed J.G.S.'s case stated in J.G.S.'s medical records that "[t]here are multiple risk factors [for child maltreatment] noted when CARE team talked to mom and per social work evaluation including mom's untreated mental health . . . ." Mother's medical records note that, while pregnant with J.G.S., Mother suffered from "untreated bipolar disorder, and depression" and received "limited prenatal care (mom was seen at UTMB twice)."

35

Her medical records from her emergency-room visit with J.G.S. also state that she "has diagnosis of Bipolar and Schizophrenia that are currently untreated." The Department investigator who testified at trial said that Mother had told her that she had diagnoses of "Bipolar, schizophrenia, postpartum depression," "PTSD," and "anxiety," and was not consistently taking the medication she had been prescribed. *See A.A.*, 2026 WL 1689341, at *9 (affirming termination of parental rights under subsections (D) and (E) based in part on evidence that parent who had mental-health issues requiring medication had "stopped and started her medications, including not taking the medication for multiple months during the pendency of the case"); *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (affirming termination of parental rights under subsection (E) based in part on parent's mental health and noncompliance with medication schedule). Mother testified that she was not seeing any mental health provider on a regular basis. The CPS supervisor testified that the Department was concerned "that the mother has gone back and forth with -- in the acceptance of mental health diagnosis, any follow-through with the evaluations that will determine the needs for medication or different treatment recommendations." She noted that Mother had also not completed mental-health counseling to which the Department had referred Mother as part of her service plan. *See In re S.R.*, 452 S.W.3d 351, 363 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (affirming

termination of parental rights under subsections (D) and (E) based in part on evidence of parent's failure to participate in services related to treatment of mental illness). In the face of this evidence, the trial court could reasonably have interpreted Mother's testimony that she did not have any untreated mental illness and was unaware of any requirements related to her mental health that she had not fulfilled as evidence supporting rather than weighing against an endangerment finding. *In re R.R.*, 711 S.W.3d 126, 140 (Tex. App.—Houston [1st Dist.] 2024, no pet.) (affirming termination of parental rights under subsections (D) and (E) based in part on evidence that parent, despite her mental health diagnosis, denied she had any need to address her mental health).

We overrule Mother's third point of error, related to subsections (D) and (E). Because we have concluded that sufficient evidence supported the trial court's endangerment findings, and conclude below that sufficient evidence supported the trial court's best-interest finding, we do not need to review Mother's fourth point of error, challenging the sufficiency of the evidence supporting the trial court's finding under subsection (N). *See A.V.*, 113 S.W.3d at 363.

## C.    Best Interest of J.G.S.

In Mother's fifth issue, she contends that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in J.G.S.'s best interest. *See* TEX. FAM. CODE § 161.001(b)(2).

37

There is a strong presumption that the best interest of a child is served by keeping the child with the child's natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing TEX. FAM. CODE § 153.131(b)); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). However, prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE § 263.307(a).

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best-interest finding: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). These factors are not exhaustive, and evidence is not required on each factor to support a finding that terminating a parent's rights is in the child's best interest. *Id*. at 372; *D.R.A.*, 374 S.W.3d at 533. Moreover, evidence supporting termination under one of the grounds listed in section 161.001(b)(1) can

also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (holding same evidence may be probative of both section 161.001(b)(1) grounds and best interest).

### 1. Mother's ability to provide J.G.S. safe environment

Much of the evidence relevant to the trial court's endangerment findings is also relevant to our assessment of Mother's willingness and ability to provide J.G.S. a safe home environment. Mother was unemployed at the time of trial and had been unable to find work. Her lease, which she obtained through a non-profit organization, was scheduled to terminate within a year of trial. *See In re B.J.C.*, 495 S.W.3d 29, 39 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (noting child's need for permanence through establishment of stable, permanent home is paramount consideration in best-interest determination).

As noted above, the Department had concerns that Mother had trouble feeding J.G.S. properly even when provided with supplies and instructions. *See In re J.C.D.Y.*, No. 01-25-00640-CV, 2025 WL 4099753, at *18 (Tex. App.—Houston [1st Dist.] Feb. 3, 2026, pet. denied) (mem. op.) (listing food as among child's basic needs to be considered in reviewing parent's ability to meet child's present and future physical and emotional needs). The Department was also concerned that Mother had mental-health issues that were unacknowledged and untreated, and that Mother had not completed mental-health counseling and

assessments to which she was referred. *See In re N.S.M.*, No. 01-20-00764-CV, 2021 WL 1217328, at *5 (Tex. App.—Houston [1st Dist.] Apr. 1, 2021, pet. denied) (mem. op.) (noting impact of parent's mental health on parenting and stability of home may be considered when determining child's best interest).

The record does not contain any history of drug or alcohol use or abuse by Mother other than social drinking and, for some period, marijuana use. *See In re M.A.J.*, 612 S.W.3d 398, 415 & n.22 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (as part of best-interest analysis, distinguishing between marijuana use and use of "hard drugs," and noting that "courts' consideration of parental marijuana use in termination-of-parental-rights cases is evolving"). Moreover, Mother testified that she had not smoked marijuana since 2018 and, each time she submitted to drug testing as part of her service plan, she tested negative. *See A.A.*, 2026 WL 1689341, at *15 (citing parent's series of negative drug-test results as evidence contrary to finding that termination of parental rights was in child's best interest). A drug test conducted on J.G.S. early in her stay at Texas Children's Hospital was negative.

However, Mother did not participate in all drug testing for which she was scheduled. *See In re J.H.G.*, No. 01-16-01006-CV, 2017 WL 2378141, at *6 (Tex. App.—Houston [1st Dist.] June 1, 2017, pet. denied) (mem. op.) (stating father's failure to participate in court-ordered drug test was equivalent to positive test

result). And in her December 2024 affidavit, the Department investigator stated that Mother had told her that she had smoked marijuana occasionally while pregnant and as recently as the day before she brought J.G.S. to the emergency room. There is evidence in the record that a CPS investigation had been initiated with regard to one of Mother's older children after that child's hair tested positive for marijuana in 2019. While marijuana use may be distinguishable from the use of hard drugs, Mother's purported use of marijuana while pregnant with J.G.S. even after her marijuana use caused one of her older children to test positive for marijuana is sufficiently suggestive of a pattern of dangerous conduct that may continue into the future to factor into a best-interest analysis. *See In re E.D.*, 682 S.W.3d 595, 607 (Tex. App.—Houston [1st Dist.] 2023, pet. denied) (noting that "continuing pattern of illegal drug use . . . will support a finding that termination of parental rights is in a child's best interest").

Mother testified that she was seeking a short continuance of the proceedings to enable her to complete her services and reunite with J.G.S. Mother testified that her desired outcome was for her and J.G.S. to move in with her mother or, if she was not allowed to retain custody of J.G.S., for her mother to have custody. J.G.S.'s maternal grandmother had been a source of support for Mother and J.G.S. but, having moved to Dallas, had been less help to Mother with J.G.S. than she had been with Mother's two older children. It is not clear from the record the extent to

which a placement with J.G.S.'s maternal grandmother had been considered and, if that possibility had been rejected, why. J.G.S.'s maternal grandmother had said she was willing to have Mother and J.G.S. live with her. At one point, J.G.S.'s maternal grandmother was in the process of moving from Texas to Georgia and, at that stage, Mother was not inclined to move to Georgia. But it appears that either the move did not occur or Mother had moved back to Texas by the time of trial.

## 2. J.G.S.'s environment, needs, and desires

At the time of trial, J.G.S. had been in foster care for almost a year. The CPS supervisor testified that the Department was requesting that Mother's parental rights to J.G.S. be terminated so that J.G.S. could be adopted. J.G.S.'s foster mother was present at trial, and was licensed and prepared to adopt J.G.S. if the trial court terminated Mother's parental rights. The supervisor testified that the Department had no concerns regarding the foster placement. Since being placed with her foster parent, J.G.S. had thrived, gained significant weight, and was meeting her milestones. At the time of trial, J.G.S. was not on any medication or receiving any special services. The supervisor believed that J.G.S.'s foster mother would pass an adoptive home study. She believed that it was in J.G.S.'s best interest that J.G.S. remain in her current placement, and that the parental rights of Mother and J.G.S.'s alleged father be terminated.

### 3.    Analysis

The evidence at trial was legally and factually sufficient to support the trial court's best-interest finding. Considering all evidence in the record in the light most favorable to that finding, and deferring to the trial court as the sole arbiter when assessing the credibility and demeanor of witnesses, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that the trial court's best-interest finding was true. *See J.F.C.*, 96 S.W.3d at 266; *H.R.M.*, 209 S.W.3d at 108. We have not found disputed evidence that a reasonable factfinder could not have resolved in favor of the trial court's best-interest finding that is so significant that the trial court could not have reasonably formed a firm belief or conviction in its best-interest finding. *J.F.C.*, 96 S.W.3d at 266.

We overrule Mother's fifth point of error.

## Conclusion

We affirm the trial court's decree of termination.

Amparo "Amy" Guerra
Justice

Panel consists of Justices Guerra, Gunn, and Morgan.